# KEN S. RADOVSKY v. STATE OF MARYLAND

[No. 72, September Term, 1982.]

*Decided August 9, 1983.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*Jeffrey F. Liss,* with whom were *Kenneth G. Jaffe* and *Wald, Harkrader & Ross* on the brief, for appellant.

*Carmina Szunyog, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

ELDRIDGE, J., delivered the opinion of the Court.

The petitioner in this case, Ken S. Radovsky, was convicted of two counts of burglary and one count of theft. The evidence at trial included inculpatory statements and actions by him during two days of custodial interrogation by the police. The interrogation of the petitioner occurred subsequent to his request for counsel and outside of counsel's presence. We issued a writ of certiorari in this case to determine whether Radovsky's federal constitutional right to have counsel present during the interrogation was violated.

On September 15, 1980, Radovsky was arrested by the Montgomery County police in connection with the police's investigation of a series of burglaries, and he was charged with being a rogue and vagabond.[1] Upon being advised of his *Miranda* rights,[2] he refused to waive them. Radovsky was taken before a District Court Commissioner at approximately 3:00 a.m. on September 16, 1980. As he was unable to post the bond set by the Commissioner, Radovsky was placed in the Montgomery County Detention Center.

---

1. *See* Maryland Code (1957, 1982 Repl. Vol.), Art. 27, § 490.
2. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

On the evening of September 16th, the police obtained a warrant for Radovsky's arrest on the charge of attempted burglary, and, at approximately 3:00 p.m. on September 17th, he was transported from the detention center to the Rockville police station where he was formally arrested on the attempted burglary charge. At the time, the arresting officer, Terry Judith, advised Radovsky of his *Miranda* rights. The accused refused to waive these rights, as well as the right to prompt presentment before a District Court Commissioner. In addition, Radovsky specifically requested the assistance of counsel; however, he was unable to contact his attorney after repeated attempts over the next two days. Although Officer Judith stated that he did not "question" Radovsky after the request for counsel, the officer testified that, after the request for counsel, he told Radovsky that he "was investigating numerous burglaries," and "I told him that I believed he was involved in more than just what I had him for there at the time."

Following the arrest on the attempted burglary charge and Radovsky's request for counsel, Officer Judith telephoned the "Crimes Against Property Unit" of the Montgomery County Police Department and spoke with Detective Gary Rademaker, informing Rademaker of the accused's arrest and Judith's suspicions that Radovsky was involved in other Montgomery County burglaries. Officer Judith also told Detective Rademaker that Radovsky wished to remain silent. Judith asked Rademaker to come to the Rockville police station for the purpose of questioning Radovsky.

At approximately 6:00 p.m. on September 17th, three hours after the arrest for attempted burglary, Detectives Rademaker and Donald Deaton arrived at the Rockville police station where they conferred with Judith. According to Detective Rademaker's testimony, Officer Judith at that time "indicated [that] Mr. Radovsky attempted to call an attorney several times, and [that] he could not reach him."

After conferring with Officer Judith, Detectives Rademaker and Deaton approached Radovsky who was

handcuffed to a table in the interrogation room of the police station. Detective Deaton described the encounter as follows (emphasis added):

> "We approached Mr. Radovsky and we identified ourselves as detectives from Crimes Against Property and basically stated to him that he knew why he was there, and *we wanted to talk to him about any involvement that he might have.*"

\* \* \*

> "At that time, we related to him that if he didn't want to talk to us, we would leave . . . ."

Detective Rademaker's testimony, to the same effect, was as follows (emphasis added):

> "Q. . . . Specifically, when you went into the room where Mr. Radovsky was seated, handcuffed to the table, who spoke to him first, you or Deaton?"
>
> "A. I believe I did."

\* \* \*

> "A. I asked how he was and I indicated that he had not changed in appearance for the last five years. I asked about his father and how things were going."
>
> "Q. Why did you do that? What was your purpose in doing that?"
>
> "A. To make for a relaxed situation."
>
> "Q. In the hope you could get him to speak to you and tell you about criminal involvement?"
>
> "A. So we could set the content of the interview in a relaxed state."
>
> "Q. Did you then unhandcuff him?"
>
> "A. I don't recall whether I did or not."

* * *

"A. I asked him if he wanted to talk to us about his involvement in burglaries and that we certainly weren't going to beat him or anything else. If he wanted to talk with us, that was great, and if not, we were going to leave."

Later Detective Rademaker reiterated:

"We had said that we understood he was in a jam about some burglaries and peeping tom charges; would he like to talk to us about them. If he did not wish to talk to us, we would leave."

In response, Radovsky indicated to the detectives that he would talk to them. Radovsky then signed a form waiving his right to have counsel present, to remain silent and to an immediate appearance before a commissioner. According to the detectives' testimony, they then began to interrogate the accused about unsolved Montgomery County burglaries in general, not having any particular burglaries in mind.

During the course of interrogation, Radovsky made inculpatory statements about his involvement in several burglaries and stated that some of the property from these burglaries was in his apartment. After signing a consent to search form, Rodovsky accompanied Deaton, Rademaker and Judith to his apartment where various articles of property were identified, removed and transported to the police headquarters. The police officers then drove the accused around Montgomery County, asking him to identify the residences from which the property had come.

Later in the evening of September 17th, between 11:00 p.m. and midnight, Radovsky was taken before a District Court Commissioner on the attempted burglary charge for which he had been arrested earlier that day.

On September 18th, Radovsky was again interrogated by Judith and Rademaker while riding throughout the county in a police car, and again he identified residences from which he had taken property. They also returned to Radovsky's apartment where he identified additional articles of stolen property.

Radovsky was eventually charged with burglary and related offenses in six individual cases. Prior to the date set for trial, he moved to suppress all of his incriminating statements and all of the physical evidence seized by the police. In support of this motion, he argued that the interrogation by the police on September 17th violated his constitutional right to have counsel present during interrogation. He further argued that his statutory right of prompt presentment before a commissioner, pursuant to Maryland District Rule 723 a, was violated.

Following testimony and arguments at the suppression hearing, the judge ruled that the delay in presenting Radovsky to a commissioner after his arrest on the 17th was impermissible under Maryland District Rule 723 a. Consequently, the judge suppressed all statements made by the defendant and all evidence seized prior to his appearance before a commissioner on the evening of September 17th. The judge ruled, however, that the evidence seized and statements made on September 18th, subsequent to his appearance before a commissioner, should not be excluded from trial.

At trial Radovsky renewed his motion to suppress all of his incriminating statements and the physical evidence seized by the police, but the trial judge overruled the motion, refusing to disturb the ruling at the prior suppression hearing. Following a nonjury trial, the defendant was convicted on two counts of burglary and one count of theft, and he was sentenced to eight years imprisonment.

Radovsky appealed to the Court of Special Appeals which affirmed the conviction in an unreported opinion. Radovsky then filed a petition for a writ of certiorari, which we granted. He argues that after he had requested the assistance of counsel, the police improperly initiated custodial interrogation, thus resulting in a violation of his constitutional right to have counsel during interrogation. Consequently, according to Radovsky, the incriminating statements and evidence obtained after the request for counsel should not have been admitted at the trial. Reliance is

placed on *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Alternatively, Radovsky argues that the inculpatory statements and evidence obtained from him after September 17th should have been suppressed because they were the fruit of a detention in violation of Maryland District Rule 723 a.

Because we shall hold that the defendant's right to have counsel during interrogation was violated, under the principles of *Edwards* and *Miranda,* and thus all evidence obtained from Radovsky subsequent to his request for counsel should have been suppressed, it is unnecessary for us to address Radovsky's argument based on Maryland District Rule 723 a.

In arguing that there was no violation of Radovsky's right to have counsel during interrogation, the State concedes that Radovsky, after he invoked his right to counsel, did not initiate renewed contact with the police, and that it was the police who initiated further questioning about the accused's "involvement in burglaries." Nevertheless, the State argues that the Supreme Court cases do not establish a *per se* rule precluding police initiated interrogation after an arrestee has expressed a desire to have counsel present. Instead, the State contends, the question is whether the arrestee, after invoking his right to counsel, thereafter waives that right. Whether there is a waiver, according to the State, depends upon all of the facts and circumstances surrounding the case. In arguing that Radovsky waived his right to have counsel present at interrogation, the State chiefly relies upon his signing a waiver form after Detectives Rademaker and Deaton initiated further communication. The State, attempting to minimize the fact that the police initiated this further communication, asserts that the questioning by the two detectives related to different crimes than the attempted burglary for which Radovsky had been arrested, and that the questioning related to crimes "for which he was not even a suspect" (State's brief, p. 8). As support for its argument, the State relies upon Justice Powell's concurring opinion in

*Edwards v. Arizona,* 451 U.S. at 488-492, and upon *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). The opinions of the Supreme Court from *Miranda* until the present, however, demonstrate that the State's argument is untenable.

In *Miranda v. Arizona, supra,* the Supreme Court held that under the Fifth and Fourteenth Amendments, the prosecution generally may not introduce at trial statements made by the defendant, which stem from custodial interrogation of the defendant, unless certain procedural safeguards are employed. The procedural safeguards are that, prior to questioning, the defendant must be advised that he has a right to remain silent, that any statement he does make may be used against him, and that he has a right to the presence of counsel. The Court pointed out that these rights may be waived if the waiver is voluntary, knowing and intelligent. The Court then set forth an important caveat: if the defendant indicates in any manner that he wants the presence of an attorney, *all* questioning must cease. The Court thus stated (384 U.S. at 444-445, emphasis supplied):

> "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. *If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.* Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him."

In *Michigan v. Mosley, supra,* 423 U.S. 96, upon which the State relies, the defendant was arrested for robbery, given his *Miranda* warnings, and chose to remain silent, at which

time the interrogation ceased. Later, he was questioned by another police officer, at a different location, about an unrelated murder. On this occasion he was again given *Miranda* warnings, and he chose not to remain silent. During this questioning the accused made inculpatory statements which were later used to convict him of murder. The Court held that the principles of *Miranda v. Arizona* were not violated by admission of the statements, because the authorities "resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." 423 U.S. at 106. Significantly, however, the Supreme Court distinguished the case before it from the situation where an arrestee indicated a desire to consult with a lawyer. The Court stated in *Mosley* (*id.* at 101 n. 7):

> "The present case does not involve the procedures to be followed if the person in custody asks to consult with a lawyer, since Mosley made no such request at any time. Those procedures are detailed in the *Miranda* opinion as follows:
>
>> 'If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.' . . . *Id.*, at 474."

Later, in *Fare v. Michael C.,* 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), the Court reaffirmed and explained the *per se* prohibition against "all" interrogation after an arrestee has requested counsel (442 U.S. at 719, emphasis added):

"The rule in *Miranda,* however, was based on this Court's perception that the lawyer occupies a critical position in our legal system because of his unique ability to protect the Fifth Amendment rights of a client undergoing custodial interrogation. Because of this special ability of the lawyer to help the client preserve his Fifth Amendment rights once the client becomes enmeshed in the adversary process, the Court found that 'the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system' established by the Court. *Id.,* at 469 [, 86 S.Ct., at 1625]. Moreover, the lawyer's presence helps guard against overreaching by the police and ensures that any statements actually obtained are accurately transcribed for presentation into evidence. *Id.,* at 470, [86 S.Ct., at 1625].

"*The* per se *aspect of* Miranda *was thus based on the unique role the lawyer plays in the adversary system of criminal justice in this country.* Whether it is a minor or an adult who stands accused, the lawyer is the one person to whom society as a whole looks as the protector of the legal rights of that person in his dealings with the police and the courts. For this reason, the Court fashioned in *Miranda* the *rigid rule that an accused's request for an attorney is* per se *an invocation of his Fifth Amendment rights, requiring that all interrogation cease.*"

See also *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

Fifteen years after *Miranda,* and three years after *Fare v. Michael C., supra,* the Supreme Court applied the above-quoted principles in *Edwards v. Arizona, supra.* The critical facts of *Edwards* are quite similar to those in the present case,[3] and the holding in *Edwards* is dispositive

---

3. The Supreme Court in *Edwards* took the facts, for the most part, from

here. The defendant Edwards and several others were arrested in connection with the investigation of a robbery and death at a bar in Tucson, Arizona. Upon his arrest, Edwards was informed of his *Miranda* rights, stated that he would submit to questioning, was interrogated by a detective, and gave a taped statement presenting an alibi defense. Edwards then indicated that he wanted to "make a deal." After some further discussion, Edwards stated that he wanted "an attorney before making a deal," and at that time (6:30 p.m.) all the questioning stopped. The next morning (9:15 a.m.), two other detectives, who did not know that Edwards had made the statement about an attorney, arrived at the jail and asked to see Edwards. The detention officer told Edwards that the detectives were there to see him; Edwards told the officer that he did not wish to speak to anyone; the detention officer replied "that he had to," and Edwards was thereupon taken to see the detectives. The two detectives identified themselves, stated that "they wanted to talk to him," and "[a]t that point they explained to him that he had the right to remain silent and the right to an attorney and the other *Miranda* rights" (122 Ariz. at 209). Edwards responded that he was willing to talk but first wanted to hear the taped statement of an alleged accomplice. After listening to the statement, Edwards said that he would make a statement so long as it was not tape-recorded. Upon being told by the detectives that recording was irrelevant, and that they could testify in court as to whatever he said, Edwards gave a statement implicating himself in the crime.

The reasoning of the Supreme Court of Arizona, in holding that Edwards's inculpatory statement was admissible, largely parallels the State's argument in the present case. The Arizona court indicated that *Miranda* does not create a *per se* rule precluding a defendant "from responding to subsequent inquiries from police after the right to an attorney has been invoked so long as the waiver is otherwise

---

the opinion of the Supreme Court of Arizona, 451 U.S. at 478 n. 1. The Arizona Supreme Court's opinion contains additional factual details, State v. Edwards, 122 Ariz. 206, 594 P.2d 72 (1979).

voluntary" (122 Ariz. at 211). The Arizona court also relied upon *Michigan v. Mosley, supra.* The court took the position that the critical issue was whether the defendant voluntarily waived the right to an attorney, and it upheld the trial court's findings that there was a waiver of the right to counsel and that the confession was voluntary.

In reversing the decision of the Arizona court, the United States Supreme Court in *Edwards* set forth its holding as follows (451 U.S. at 484-485):

> "[A]lthough we have held that after initially being advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation, . . . the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."

The Court went on to say that this holding was indicated by the opinion in *Miranda,* and it quoted *Fare v. Michael C., supra,* that *Miranda* created a "rigid" and *"per se"* rule when an arrestee requests an attorney (451 U.S. at 485). The Court pointed to the language from *Michigan v. Mosley, supra,* which "distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney" *(ibid.).* The Supreme Court then emphasized in *Edwards (ibid.):*

> "We reconfirm these views and, to lend them sub-
> stance, emphasize that it is inconsistent with
> *Miranda* and its progeny for the authorities, at
> their instance, to reinterrogate an accused in
> custody if he has clearly asserted his right to coun-
> sel."

Applying these principles to the facts, the Supreme Court indicated that if Edwards had initiated the meeting with the two detectives on the morning following his invocation of the right to counsel, "nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at trial" *(ibid.)*. But because it was "the police [who] returned to him the next day," and "not at his suggestion or request," and because "the detectives told Edwards that they wanted to talk to him" *(id.* at 487), the Supreme Court concluded:

> "We think it is clear that Edwards was subjected to
> custodial interrogation on January 20 within the
> meaning of *Rhode Island v. Innis, supra,* and that
> this occurred at the instance of the authorities. His
> statement, made without having had access to
> counsel, did not amount to a valid waiver and hence
> was inadmissible." *(Ibid.)*

Turning to the present case, Radovsky, like Edwards, requested counsel after arrest, and the questioning stopped.[4] In both cases, sometime later (3 hours in *Radovsky* and over 12 hours in *Edwards*) two other detectives came to see the defendants for the purpose of questioning them. In neither case did the defendant request or suggest such contact. In both cases, the teams of detectives initiated the communica-tions about the criminal activity, indicating simply that they wanted to talk about the defendants' involvement, and then giving new *Miranda* warnings.[5] The two cases cannot

---

4. Although, as previously pointed out, in the present case Officer Judith continued to speak briefly about the matter.

5. In two respects, the action of the detective team in the present case was

be distinguished on any principled basis. The rule set forth in *Edwards,* that when an arrestee expresses his desire to have counsel present all interrogation must cease "unless the accused himself initiates further communication" (451 U.S. at 485), is controlling here.

If there could remain any possible doubts about the applicable rule after *Edwards,* they were laid to rest by the very recent opinions joined by eight Supreme Court Justices in *Oregon v. Bradshaw,* U.S. , 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).[6] In *Bradshaw* the Oregon police were investigating the death of a minor whose body was found in his wrecked pickup truck. The defendant Bradshaw was asked to accompany the police officers to the station, was given *Miranda* warnings, and he told the police that he had provided the deceased with liquor at the deceased's house. Bradshaw was then arrested on a charge of furnishing liquor to a minor and again given *Miranda* warnings. After some further conversation with a police officer, Bradshaw stated that he wanted an attorney, and the officer immediately terminated the conversation. Later, while being transported to the county jail or immediately prior to such trip, Bradshaw initiated conversation with a police officer by asking, "Well, what is going to happen to me now?" The officer answered by telling Bradshaw that he did "not have to talk to me. You have requested an attorney . . . ." Bradshaw stated that he understood, and a discussion ensued between the two about where Bradshaw was being taken and the offense. The officer suggested a polygraph examination, and Bradshaw agreed. The next day, after the examination, the examiner told Bradshaw that he believed Bradshaw was lying, and Bradshaw then admitted having been at the wheel of the pickup truck and having consumed much alcohol. Bradshaw

a more serious breach of the *Miranda* rule requiring that interrogation cease after a request for counsel. In the present case the detectives were informed that the defendant was trying to obtain counsel, whereas the detectives in *Edwards* had no knowledge that the defendant wanted counsel. Also the police-initiated communications were somewhat more extensive in the present case. On the other hand, in *Edwards,* the detention officer had told the defendant that he must see the detectives.

**6.** *See also* the extensive discussion of *Edwards* and the other pertinent Supreme Court cases by Chief Judge Gilbert for the Court of Special Appeals in Bryant v. State, 49 Md.App. 272, 431 A.2d 714 (1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982).

was charged and later convicted of manslaughter, driving while under the influence of alcohol, and driving with a revoked license. A plurality opinion of four Supreme Court Justices made it clear that, under *Edwards,* an arrestee who has invoked the right to counsel cannot be questioned unless the arrestee initiates further conversation, and that this "prophylactic rule" was separate from the question of whether, under the circumstances, there was a waiver of counsel. The plurality opinion thus stated (51 L.W. at 4941):

> "We think the Oregon Court of Appeals misapprehended the test laid down in *Edwards.* We did not there hold that the 'initiation' of a conversation by a defendant such as respondent would amount to a waiver of a previously invoked right to counsel; we held that after the right to counsel had been asserted by an accused, further interrogation of the accused should not take place 'unless the accused himself initiates further communication, exchanges, or conversations with the police.' 451 U.S., at 485. This was in effect a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers in the manner in which the defendant in *Edwards* was. We recently restated the requirement in *Wyrick v. Fields,* U.S. , (1982) *(per curiam),* to be that before a suspect in custody can be subjected to further interrogation after he requests an attorney there must be a showing that the 'suspect himself initiates dialogue with the authorities.'
>
> "But even if a conversation taking place after the accused has 'expressed his desire to deal with the police only through counsel,' is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation.

* * *

"Thus, the Oregon Court of Appeals was wrong in thinking that an 'initiation' of a conversation or discussion by an accused not only satisfied the *Edwards* rule, but *ex proprio vigore* sufficed to show a waiver of the previously asserted right to counsel. The inquiries are separate, and clarity of application is not gained by melding them together.

"There can be no doubt in this case that in asking, 'Well, what is going to happen to me now?', respondent 'initiated' further conversation in the ordinary dictionary sense of that word."

The opinion, while pointing out that certain routine inquiries, such as a request for water or to use the telephone, would not amount to the initiation of conversation in the *Edwards* sense, stated that a "generalized discussion relating . . . to the investigation" did constitute the initiation of conversation in the *Edwards* sense, and that Bradshaw's query was sufficient *(ibid.)*. The dissenting opinion of four other justices in *Bradshaw* agreed with the principles set forth in the plurality opinion, but disagreed that the defendant's inquiry indicated a "desire to discuss the subject matter of the criminal investigation." 51 L.W. at 4944.[7]

---

**7.** If the defendant's statement in *Bradshaw* constituted the initiation of communication for purposes of the *Edwards* rule, clearly the statements of Detectives Rademaker and Deaton in the instant case constituted the initiation of communications about the subject matter of the criminal investigation.

*Bradshaw* also disposes of the State's assertion in the present case, which is unsupported by any authority, that the *Edwards* rule does not apply if the subsequent police questioning, after the right to counsel has been invoked, relates to a different offense than that for which the defendant was earlier arrested. In *Bradshaw* the defendant was initially arrested for serving liquor to a minor, but the later questioning concerned offenses associated with driving the vehicle. *See also* United States Ex Rel. Kimes v. Greer, 527 F.Supp. 307 (N.D. Ill. 1981); State v. Branam, 627 S.W.2d 8 (Ark. 1982); State v. Taylor, 56 Or.App. 703, 643 P.2d 379 (1982). Moreover, in the present case, the later questioning by Detectives Rademaker and Deaton did not concern a different offense but related generally to recent burglaries in Montgomery County.

The principles set forth in the above-discussed cases require that Radovsky's convictions be reversed.

*Judgment of the Court of Special Appeals reversed, and case remanded to that Court with directions to reverse the judgments of the Circuit Court for Montgomery County and remand the case to that Court for a new trial.*

*Costs to be paid by Montgomery County.*