537 A.2d 1167

**STATE of Maryland**

v.

**Christopher Holmes CONOVER.**

**No. 50, Sept. Term, 1986.**

Court of Appeals of Maryland.

March 7, 1988.

34

Jillyn K. Schulze, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., on the brief), Baltimore, for appellant.

Michael R. Braudes, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, COUCH,* McAULIFFE and ADKINS, JJ.

McAULIFFE, Judge.

■ When an individual in custody requests an attorney, interrogation must cease until an attorney is present, unless the accused himself initiates further communication, exchanges, or conversations with the police. *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Interrogation means not only express questioning, "but also ... any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980). The question presented by this appeal is whether the actions of the police in reading a statement of charges to the Respondent, and handing to him copies of the charging document and the application upon which it was based, constituted, under the circumstances here present, the functional equivalent of questioning, and thereby deprived Respondent of his Fifth Amendment right to have counsel present at a custodial interrogation.

Linda Jordan identified Christopher Holmes Conover as one of three men who wounded her and killed her husband and daughter. Conover and another man gained entrance to the Jordan home by claiming to be police officers. Once inside, they produced handguns, handcuffed the three members of the family, and admitted a third person, Gregory

---

* COUCH, J., now retired, participated in the hearing and conference of this case while an active member of this Court, after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Jones.[1]  After ransacking the house and taking jewelry from Mrs. Jordan, the three men forced their victims to the floor.  Firing through a pillow, Jones shot and killed Mr. Jordan and his daughter as they lay handcuffed together, and shot Mrs. Jordan in the head.  Mrs. Jordan feigned unconsciousness until the three men left, and then attempted to call for help.  Finding the telephone inoperable, she opened the front door only to be confronted again by Jones. She was able to slam and lock the door, but was again shot as one of the men saw her through a glass door.  Ultimately, she was able to leave the home and summon help.

Respondent was charged with two counts of murder, attempted murder, burglary, and related offenses.  Prior to trial, he moved to suppress any statements made by him following arrest, and this motion was heard by Judge J. William Hinkel.  The only witness to testify at the suppression hearing was Detective Ron Long, one of the two principal investigating officers.  From Detective Long's testimony, and from an examination of the original charging documents, we learn the circumstances under which the Respondent made the statement in question.

On December 10, 1984, following an extra-judicial identification of Respondent by the surviving victim, Detectives Long and Murnane prepared an Application for Statement of Charges (Application) against the Respondent, and submitted it to a District Court Commissioner.  Finding probable cause, the Commissioner issued a Statement of Charges containing six separate charges, and an arrest warrant. Respondent was arrested on the warrant on December 12, by officers other than the investigating detectives.  He was brought to the homicide squad room at Baltimore County Police Headquarters where he was met by Detectives Long and Murnane, who were in the company of Agent Fitzsim-

---

1. For his part in this crime, Gregory Jones was convicted of murder and other offenses and sentenced to death. *Jones v. State*, 310 Md. 569, 530 A.2d 743 (1987).

mons of the Federal Bureau of Investigation.[2] The three officers then took Respondent to the captain's office for the purpose of advising him of his rights, obtaining a statement if he should elect to waive his rights, and completing routine processing.

█ Once in the captain's office, Detective Murnane read Respondent his *Miranda* rights. Respondent said he understood his rights and wished to have an attorney. No further questions were asked, and the detectives resumed their processing. One of them read the Statement of Charges to Respondent, and handed him copies of the Statement of Charges and the Application, suggesting that he "read them, look at them, if you have any questions ask them." We are unable to determine from the record whether Respondent read the Application, but we shall assume that he did. Respondent then asked a number of hypothetical questions, in the vein of "what if" or "suppose this," and also uttered the statement that the State later used against him at trial: "you can't put me with that .38."[3]

Judge Hinkel found, as the parties had agreed, that Respondent's statement was made while he was in custody and after he had requested an attorney. Judge Hinkel found no violation of the Fifth Amendment, however, because the statement was voluntarily made and "[t]here is just nothing presented that shows that [Respondent] was

---

**2.** The Federal Bureau of Investigation had an interest in the case because of suspected drug activity by the perpetrators, the victims, or both. Agent Fitzsimmons had been working closely with the Baltimore City Police authorities and, according to Detective Long, was present both as a matter of inter-agency courtesy, and to obtain information relating to his special interest if Respondent should elect to waive his rights and answer questions.

**3.** In determining whether the statement was obtained in violation of the Fifth Amendment, it is not significant that the statement appears to be exculpatory, in the nature of a denial. *Rhode Island v. Innis,* 446 U.S. 291, 301 n. 5, 100 S.Ct. 1682, 1690 n. 5, 64 L.Ed.2d 297 (1980). The value of the statement to the prosecution lay in the permitted inference that Respondent was tacitly acknowledging his presence at the scene of the crime but disavowing any direct connection with the murder weapon.

questioned; nothing presented that shows that he was induced or persuaded to make a statement." The Court of Special Appeals reversed in an unreported *per curiam* opinion, relying upon its earlier decision in *State v. Quinn,* 64 Md.App. 668, 498 A.2d 676 (1985), and holding that delivery of the Statement of Charges and Application to the Respondent after he had requested an attorney constituted a form of interrogation. We granted certiorari, and we now reverse.

■ It is settled law that once an accused, detained in a custodial setting, has asserted his right to counsel, all interrogation must cease until an attorney has been furnished to consult with him or he initiates further communication, exchange, or conversations. *Edwards v. Arizona, supra,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85; *Miranda v. Arizona, supra; Radovsky v. State,* 296 Md. 386, 394, 464 A.2d 239 (1983). The rule of *Miranda* does not exclude every statement uttered by the accused before he is provided with counsel. "Volunteered statements of any kind are not barred by the Fifth Amendment...." *Miranda,* 384 U.S. at 478, 86 S.Ct. at 1630. As the Supreme Court recognized in *Edwards:*

> The Fifth Amendment right identified in *Miranda* is the right to have counsel present at any custodial interrogation. Absent such interrogation, there would have been no infringement of the right that Edwards invoked and there would be no occasion to determine whether there had been a valid waiver.

451 U.S. at 485–86, 101 S.Ct. at 1885.

The determination of whether there was a Fifth Amendment violation in this case turns on the question of whether there was an interrogation.

The test for determining what constitutes interrogation within the meaning of the Fifth Amendment was outlined by the Supreme Court in *Rhode Island v. Innis,* 446 U.S. at 300–01, 100 S.Ct. at 1689–90:

We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

In *Innis*, after a murder suspect had been arrested and informed of his *Miranda* rights, he requested an attorney. En route to the police station, the officers transporting him discussed the possibility that children attending a nearby school for the handicapped would injure themselves if they found a loaded gun. The accused, overhearing this conversation from the back seat of the police car, volunteered to show the officers the location of a shotgun.

The Supreme Court concluded that the officers' conversation did not constitute interrogation. The officers had not expressly questioned Innis, nor did the record suggest that they were aware of any unusual susceptibility on his part to a concern for the welfare of handicapped children. Moreover, the record did not indicate that Innis was unusually disoriented or upset at the time of his arrest. Finally, the Court pointed out, this was not a case where "the police carried on a lengthy harangue in the presence of the suspect." 446 U.S. at 303, 100 S.Ct. at 1691.

■ Not all police conduct that may cause a defendant to speak constitutes interrogation. Prior to the decision in *Innis*, we considered the application of *Miranda* to the routine processing of an arrested defendant, and concluded that:

There seems to be general agreement ... that *Miranda* does not apply to "administrative questioning," the routine questions asked of all arrestees who are "booked" or otherwise processed.

*Vines v. State*, 285 Md. 369, 376, 402 A.2d 900 (1979).

To the same effect, see *Whitfield v. State*, 287 Md. 124, 142–43, 411 A.2d 415, *cert. dismissed*, 446 U.S. 993, 100 S.Ct. 2980, 64 L.Ed.2d 850 (1980). The Supreme Court later agreed, expressly excluding normal arrest and booking procedures from its definition of interrogation. *Rhode Island v. Innis*, 446 U.S. at 301, 100 S.Ct. at 1691.

In interpreting and applying the rule of *Miranda* as refined by *Edwards* and *Innis*, it is helpful to keep in mind the reasons for the existence of the rule—the evils addressed by *Miranda* and the goals of the safeguards there established. Justice Powell, writing for the Supreme Court in *Arizona v. Mauro*, —— U.S. ——, 107 S.Ct. 1931, 1935, 95 L.Ed.2d 458 (1987), recounted some of the reasons for the adoption of the rule:

> In [*Rhode Island v. Innis* ], the Court reviewed the police practices that had evoked the *Miranda* Court's concern about the coerciveness of the " 'interrogation environment.' " 446 U.S., at 299, 100 S.Ct., at 1688 (quoting *Miranda*, 384 U.S., at 457, 86 S.Ct., at 1619). The questioned practices included "the use of lineups in which a coached witness would pick the defendant as the perpetrator .... the so-called 'reverse lineup' in which a defendant would be identified by coached witnesses as the perpetrator of a fictitious crime," and a variety of "psychological ploys, such as to 'posi[t]' 'the guilt of the subject,' to 'minimize the moral seriousness of the offense,' and 'to cast blame on the victim or on society.' " 446 U.S., at 299, 100 S.Ct., at 1689 (quoting *Miranda*, 384 U.S., at 450, 86 S.Ct., at 1615) (brackets by *Innis* Court). None of these techniques involves express questioning, and yet the Court found that any of them, coupled with the "interrogation environment," was likely to " 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." 446 U.S., at 299, 100 S.Ct., at 1688 (quoting *Miranda*, 384 U.S., at 457, 86 S.Ct., at 1619).

In *Mauro*, a defendant in custody for the killing of his son invoked his right to counsel. All questioning ceased, and

the defendant was placed in the police captain's office. A request by the defendant's wife to speak with him was granted, after the police had advised both parties that they could speak together only if an officer were present to observe and hear what transpired. The wife was then brought into the room, and the brief conversation that followed was recorded by means of a tape recorder placed in plain view by the police. The defendant's statements to his wife were used by the prosecution to counter a defense of insanity.

The Supreme Court acknowledged that there was a "possibility"[4] that Mauro would incriminate himself while talking with his wife, and that the officers were aware of that possibility when they agreed to allow the Mauros to talk to each other. 107 S.Ct. at 1936. The Court found no evidence, however, that the officers had sent Mrs. Mauro in to see her husband for the purpose of eliciting incriminating statements. Pointing out that "[o]fficers do not interrogate a suspect simply by hoping that he will incriminate himself," the Court held that

> Mauro was not subjected to compelling influences, psychological ploys, or direct questioning. Thus, his volunteered statements cannot properly be considered the result of police interrogation.

> In deciding whether particular police conduct is interrogation, we must remember the purpose behind our decisions in *Miranda* and *Edwards:* preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment. The government actions in this case do not implicate this purpose in any way.... [T]he

---

4. The Court noted that the Arizona Supreme Court had concluded that the officers both knew that incriminating statements were *likely* to be made. The Court said it was not overturning any factual findings of the State Court, but rather determining that "the facts of this case do not present a sufficient likelihood of incrimination to satisfy the legal standard articulated in *Miranda v. Arizona* and in *Rhode Island v. Innis*." *Arizona v. Mauro,* —— U.S. ——, 107 S.Ct. 1931, 1936 n. 6, 95 L.Ed.2d 458 (1987).

officers in this case acted reasonably and lawfully by allowing Mrs. Mauro to speak with her husband. 107 S.Ct. at 1936–37.

■ Turning to the facts of this case, we are persuaded, as was the trial judge, that the police did not "interrogate" Respondent within the meaning of *Miranda.* They intended to question him, and took him to the captain's office for that purpose—an entirely proper procedure. However, when Respondent declined to waive his right to counsel, all questioning ceased. The officers were entitled to complete the processing of the arrestee, and were required to furnish him with a copy of the Charging Document. Maryland Rule 4–212(e) provides in pertinent part that:

[A] warrant shall be executed by the arrest of the defendant. Unless the warrant and charging document are served at the time of the arrest, the officer shall inform the defendant of the nature of the offense charged and of the fact that a warrant has been issued. A copy of the warrant and charging document shall be served on the defendant promptly after the arrest.

We infer no sinister motive from the fact that police provided Respondent with a copy of the Application as well as a copy of the Statement of Charges. Detective Long was asked on cross-examination whether anyone had suggested to the Respondent anything "about what the evidence was against him," and Detective Long said that no one had. He volunteered, however, that some reference to the evidence against Respondent would have been contained in the application, and that "we had the charging document itself so he would have had the whole packet, which he could have reviewed." We do not consider it unusual for the detectives to have treated the Application for a Statement of Charges as a part of the "packet" of charging documents. In this State, when a defendant is arrested

without a warrant, the printed form [5] for a Statement of Charges includes the statement of facts upon which the charges are based, and from which a judicial officer may later make a determination concerning the existence of probable cause for continued detention. Thus, the content of an Application for a Statement of Charges when a charging document is sought before arrest is identical to the content of a statement of probable cause that forms a part of the Statement of Charges completed by a police officer following an arrest without a warrant. Where arrest precedes the issuance of a Statement of Charges, police officers prepare both the statement of probable cause and the statement of charges, Maryland Rule 4–211(b)(2), and both appear on the same page of the form. Had Respondent been arrested without a warrant, the Statement of Charges required to be served upon him would have included the information contained in this Application, as a part of the same document. Thus, it was fortuitous that the statement of probable cause in this case appeared on a separate form.

The police of this State are also accustomed to dealing with fugitive warrants, and for many years the application for a fugitive warrant and the warrant itself have appeared on the same page of the District Court form. Similarly, the police in Maryland are accustomed to serving a copy of an Application for a Search Warrant at the same time they serve a Search Warrant, because that is required by Maryland Rule 4–601(c). Under the circumstances, it was not remarkable that the detectives would treat the Application as a part of a "packet" and serve it on the Respondent together with a copy of the Statement of Charges, even

---

5. Preprinted forms are prepared by the District Court of Maryland, and are made available to police through the District Court Commissioners. The current form for a Statement of Charges following arrest without a warrant is DC/CR 2 (revised May, 1987). Although this form has undergone stylistic changes over the years, the basic format has been the same for at least 10 years. See, *e.g.*, District Court form CR 704 (revised October, 1978).

though service of the Application was not required by rule or statute.

In finding that the Respondent was not "questioned or in some fashion or in some manner induced to make statements," the trial judge did not make a specific finding concerning the intent of the police officers in furnishing Respondent with a copy of the Application.[6] That is understandable, however, in light of the argument made to the trial judge at the suppression hearing. There, Respondent did not argue that the delivery of a copy of the application constituted interrogation. Rather, Respondent's counsel argued that the police must have verbally confronted Respondent with other evidence of his involvement in order to induce him to speak. The crux of counsel's argument was:

> I find it very strange that he would answer that in just looking at a charging document and then suggesting that I agree, you have got me. That's just preposterous that it happened exactly like that. There came a point in time at which Christopher Conover was asked whether or not he might be able to provide some information and if, in fact, that took place after he asserted his right to counsel Mr. Conover was denied his Fifth Amendment rights and as a result the statement should be suppressed.

Respondent did not testify at the suppression hearing, and no direct evidence was offered in support of this argument. The trial judge was under no obligation to accept the inference for which Respondent's counsel argued, and we accept the finding of the trial judge on that fact.

Although we accept here the findings of fact that were made by the trial judge, we are obliged to determine upon our own independent review of the record whether the police conduct in this case amounted to an "interrogation"

---

6. The intent of the police in initiating certain conduct may be helpful in determining whether interrogation took place, but it is not dispositive of that issue. *Rhode Island v. Innis,* 446 U.S. at 301–02 n. 7, 100 S.Ct. at 1690 n. 7. "Officers do not interrogate a suspect simply by hoping that he will incriminate himself." *Arizona v. Mauro,* 107 S.Ct. at 1936.

within the meaning of *Miranda*. We hold that it did not. The police acted reasonably and lawfully, and the Respondent was not subjected to compelling influences, psychological ploys, or direct questioning. His volunteered statement was properly admitted.

The Court of Special Appeals, because of the view it took of this case, did not decide all of the questions raised by Respondent. Accordingly, we remand the case to that Court for further proceedings.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY RESPONDENT.