468 A.2d 101

**Marselle Jerome BOWERS**

v.

**STATE of Maryland.**

**No. 131, Sept. Term, 1982.**

Court of Appeals of Maryland.

Dec. 9, 1983.

116

118

Arthur A. DeLano, Jr., Asst. Public Defender, Baltimore (Alan H. Murrell, Public Defender and George E. Burns, Jr., Asst. Public Defender, Baltimore, on brief), for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., and Deborah K. Handel, Asst. Atty. Gen., Baltimore, on brief), for appellee.

Argued Before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

SMITH, Judge.

Appellant, Marselle J. Bowers, was convicted of murder in the first degree by a Charles County jury. The jury subsequently determined that he should be sentenced to death. We shall affirm the conviction. However, we shall vacate the death sentence because the jury failed to find a mitigating factor which the State at trial conceded the evidence showed. The case reaches us pursuant to the provisions of Maryland Code (1957, 1982 Repl.Vol.) Art. 27, § 414 stating that whenever the death penalty is imposed we shall review the sentence.

I

The basic facts are not in dispute. Pursuant to Maryland Rule 828 g the parties have entered into an agreed statement of facts. We shall repeat only so much as is necessary

for a clear understanding of the case. Additional facts will be developed as we discuss the various contentions of the parties.

Ethel Clark lives near Maryland Rt. 90 outside Ocean City in Worcester County. At approximately 8:15 p.m. on July 8, 1981, a woman's screams and certain loud noises drew her attention to two cars parked alongside that highway. She saw no one other than a tall black man standing near the cars but she heard two voices. The larger of the two cars left the scene after about fifteen minutes. The small car was still there the next morning.

John O'Connell was the boyfriend of Monica McNamara. He was on a temporary work assignment at a hospital in Salisbury and was staying at a condominium in Ocean City. He expected Miss McNamara to join him on the evening of July 8. When she did not arrive he called her home in the Washington, D.C., suburbs but received no answer.

While enroute to work on the morning of July 9 O'Connell saw Miss McNamara's Ford Pinto parked along Rt. 90. He stopped and searched the immediate area. He found her keys and one of her sandals on the ground behind the car and her overnight bag and beach bag on the back seat of the car. He then went to Ethel Clark's house and asked her to call the police.

Later on the morning of July 9 Maryland State Police found Miss McNamara's body near a railroad overpass close to southbound U.S. Rt. 13 in Somerset County. That point is just outside Pocomoke City which is in Worcester County. The body had been dragged a short distance off the road. The cause of death was later determined to be strangulation.

The State Police learned on July 31 that a man identifying himself as Robert McNamara had been arrested in Petersburg, Virginia, on a charge of defrauding an innkeeper. This man had attempted to use Monica McNamara's credit cards to pay for his room. Two employees at the Ramada Inn in Petersburg identified Bowers as the individual who posed as Robert McNamara and used Monica McNamara's

credit cards. By stipulation the parties agreed that a handwriting expert would testify that in his opinion the signature "Robert McNamara" appearing on various documents at the Ramada Inn was in the handwriting of Bowers.

On August 1 Trooper D. Bruce Hornung of the Maryland State Police interviewed Bowers at the Petersburg jail. Hornung advised Bowers of his *Miranda* rights at approximately 9:15 a.m. Bowers signed a written waiver using the name of Robert McNamara. When advised by Trooper Hornung that he knew Robert McNamara was not his real name, appellant said that his name was Marselle Jerome Bowers.

The questioning by Trooper Hornung was directed to how Bowers came into possession of the credit cards. Several different stories were told by Bowers. At approximately 11:45 a.m. Bowers asked to use the telephone. He placed calls to several numbers before he made a connection where he carried on a conversation. When Bowers returned to the interview room he said, "I need a lawyer, but I am not going to take the rap for this thing because I didn't kill her. But I am involved in it, and I have just talked to a Christian woman and she told me to tell the truth." Bowers then proceeded to give Trooper Hornung a lengthy statement in narrative form in which he said that both he and an accomplice named Alexander Peterson had had sexual intercourse with the victim and that his accomplice had strangled the victim to death.

Bowers indicated that Peterson was a fugitive from the Chicago area. At trial the State introduced records from the Pontiac Correctional Center in Illinois showing that an Alexander Peterson was incarcerated at that institution at the time of the offense in question.

On August 2 Trooper Hornung searched the 1977 Ford LTD that Bowers had been using at the time he checked into the Ramada Inn. Several items were removed and submitted to the Maryland State Police laboratory in Pikesville. Evidence was adduced at trial showing that a piece of vinyl

taken from that vehicle was stained with type A blood, the same type as that of the victim.

Bowers presented no evidence at trial.

## II

Bowers claims that the trial court erred in denying his motion to suppress his extrajudicial statement.

### A  Right to counsel

He first contends that he invoked his right to counsel when he returned to the interview room at approximately 12:15 p.m. and made the statement we have quoted to the effect that he needed a lawyer.  Bowers argues:

"Trooper Hornung clearly understood the significance of Appellant's statement.  He was careful to record it 'verbatim.'  Instead of terminating or readvising Appellant of his *Miranda* rights, Trooper Hornung said nothing.  His choice was deliberate.  He permitted Appellant to proceed with a rambling narrative of events hoping that Appellant would incriminate himself.  Trooper Hornung's silence at this point was simply a more subtle, but nonetheless effective interrogation technique.  When Appellant gave 'false information', Trooper Hornung did not hesitate to interrupt.  He broke Appellant down for more than three hours and then, when Appellant asserted his right to counsel, he carefully refrained from further direct questioning.  Since this interrogation technique was designed to elicit incriminating information, it should be condemned."

He relies on *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); and *Whitfield v. State,* 287 Md. 124, 142–43, 411 A.2d 415, *cert. dismissed,* 446 U.S. 993, 100 S.Ct. 2980, 64 L.Ed.2d 850 (1980).  They do not support his position.  We first note that the trial judge said, "Upon consideration of the testimony and evidence presented, the Court is convinced that the

defendant was given and understood the *Miranda* warnings, and that he voluntarily made the statements at issue."

In *Edwards* the Court reaffirmed its holding in *Miranda* and said that "it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." 451 U.S. at 485, 101 S.Ct. at 1885. In the next succeeding paragraph Justice White said for the Court:

"Had Edwards initiated the meeting on January 20, nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial. The Fifth Amendment right identified in *Miranda* is the right to have counsel present at any custodial interrogation. Absent such interrogation, there would have been no infringement of the right that Edwards invoked and there would be no occasion to determine whether there had been a valid waiver. *Rhode Island v. Innis, supra,* makes this sufficiently clear. 446 U.S., at 298, n. 2 [100 S.Ct. at 1688, n. 2]." 451 U.S. at 485–86, 101 S.Ct. at 1885 (footnote omitted).

In order to determine that there is a violation we must find that interrogation took place. In *Whitfield,* 287 Md. 124, 411 A.2d 415, Judge Digges said for the Court:

"Once such custody is established, a court must still determine whether an 'interrogation' took place before a violation of *Miranda* exists. 'Interrogation,' like 'custody,' is not easily defined, although in its usual sense, it 'refers to police questioning designed to elicit a response from a suspect.' Lederer, [*Miranda v. Arizona—The Law Today,*] 78 Mil.L.Rev. [107,] 134 [(1977)]. Of course, not all questioning by law enforcement officials of one in custody is tantamount to an interrogation in the *Miranda* sense. *See Vines v. State,* 285 Md. 369, 375–76, 402 A.2d 900, 903–04 (1979). For example, in a recent opinion by Judge Orth, this Court noted: 'There seems to be general agreement ... that *Miranda* does not apply to "administrative questioning," the routine questions asked of all arrestees

who are "booked" or otherwise processed.' *Id.* at 376, 402 A.2d at 904. However, except for this type of questioning, if custody is found to exist, then any examination likely to lead to incriminating statements will be a '*Miranda* interrogation.'" 287 Md. at 142–43, 411 A.2d 415. In *Whitfield* we said, "that the mere fact that Officers Britton and Young did not intend to elicit incriminating information from Whitfield for prosecutorial purposes does not mean that they did not interrogate him in the *Miranda* sense." 287 Md. at 143, 411 A.2d 415. Their concern there was to secure the prison area by locating a gun known to be within the area.

In *Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297, Justice Stewart said for the Court:

"[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." 446 U.S. at 300–01, 100 S.Ct. at 1689–1690 (footnotes omitted).

In *Innis* the accused was arrested and given his *Miranda* rights at which time he requested an attorney. He was placed in the back of a police car and transported to the police station in the company of three officers. The officers had been instructed "not to question the respondent or intimidate or coerce him in any way" enroute to the station. 446 U.S. at 294, 100 S.Ct. at 1686. During that trip one officer said he frequented the area in question while on patrol and that because of a school for handicapped children located nearby it would be conceivable that one might hurt himself if he found a weapon with shells. A second officer concurred in this concern and said that he should continue to

search for the weapon and try to find it. The accused then interrupted the conversation, stating that the officer should turn the car around so he could show them where the gun was located. At the scene of the search a police captain again advised the accused of his *Miranda* rights. As the Supreme Court put it, "The respondent replied that he understood those rights but that he 'wanted to get the gun out of the way because of the kids in the area in the school.'" 446 U.S. at 295, 100 S.Ct. at 1687. He then led the police to a nearby field where the shotgun was under some rocks by the side of the road. *Id.* After first having said, "A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation," 446 U.S. at 301, 100 S.Ct. at 1690, the Court said:

"Turning to the facts of the present case, we conclude that the respondent was not 'interrogated' within the meaning of *Miranda.* It is undisputed that the first prong of the definition of 'interrogation' was not satisfied, for the conversation between Patrolmen Gleckman and McKenna included no express questioning of the respondent. Rather, that conversation was, at least in form, nothing more than a dialogue between the two officers to which no response from the respondent was invited.

"Moreover, it cannot be fairly concluded that the respondent was subjected to the 'functional equivalent' of questioning. It cannot be said, in short, that Patrolmen Gleckman and McKenna should have known that their conversation was reasonably likely to elicit an incriminating response from the respondent. There is nothing in the record to suggest that the officers were aware that the respondent was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children. Nor is there anything in the record to suggest that the police knew that the respondent was unusually disoriented or upset at the time of his arrest.

"The case thus boils down to whether, in the context of a brief conversation, the officers should have known that

the respondent would suddenly be moved to make a self-incriminating response. Given the fact that the entire conversation appears to have consisted of no more than a few offhand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly 'evocative.' It is our view, therefore, that the respondent was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him." 446 U.S. at 302–03, 100 S.Ct. at 1690–1691 (footnote omitted).

Factually similar to this case is *Leuschner v. State,* 49 Md.App. 490, 433 A.2d 1195, *cert. denied,* 291 Md. 778 (1981), decided after *Edwards.* An earlier version of that case, *Leuschner v. State,* 45 Md.App. 323, 413 A.2d 227, *cert. denied,* 288 Md. 738 (1980), was remanded to the Court of Special Appeals by the Supreme Court of the United States on the same day that it decided *Edwards* in order that the intermediate appellate court might consider the case in the light of *Edwards.* Judge Lowe in *Leuschner II* said for the court:

"Perhaps because he recognized discrepancies within his interviews, during the late afternoon of the day of his arrest, Leuschner asked for an attorney. This request was not specified in regard to the fugitive warrant under which he was detained, but was obviously in regard to the Rusty Marine questioning. The police offered Leuschner the use of the telephone (already next to him) to call an attorney or, in the alternative, offered to call an attorney for him. Leuschner neither called nor requested assistance but asked rather to see his paramour, Betty Larmore, who was in the next room and who was immediately brought into the interrogation area. Without the slightest instigation by the police officers, Leuschner continued

his conversation, talking first to Ms. Larmore in the presence of the officers and subsequently joining them in his conversation." 49 Md.App. at 494–95, 433 A.2d 1195.

The court went on to say:

"Whether police conduct is tantamount to a reinterrogation following Fifth Amendment invocation by request for counsel in the contemplation of *Miranda,* is also dependent upon the particular facts and circumstances of each case. *Vines v. State,* 285 Md. 369, 376 [402 A.2d 900] (1979). Here, although Leuschner's version contradicted portions of the State's case as to his request for an attorney as well as his advisement of rights, the judge simply did not believe him and did believe the State's testimony. While his ruling was from a position of advantage, our own independent constitutionally required review of a cold record reveals clearly that his judgment was correct. That record reveals not a scintilla of compulsion, nor any indication that there were words (or actions which were their functional equivalent) which would have been reasonably likely to elicit an incriminating response. There was simply no interrogation by the police until well after Leuschner had, by his conduct, words and actions, waived the prior invocation of his right to have counsel present." 49 Md.App. at 496–97, 433 A.2d 1195.

On the issue of whether the police initiated what Leuschner called an interrogation, the court said:

"Listening to a garrulous 'suspect' uninterruptedly rattle on alternately to his girlfriend and the police is not an 'initiation' of an interrogation—even if such conduct could have been interpreted as a functional equivalent of questioning." 49 Md.App. at 498, 433 A.2d 1195.

It must not be forgotten that in *Edwards* the Court said: "We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communi-

cation, exchanges, or conversations with the police." 451 U.S. at 484–85, 101 S.Ct. at 1885.

The Supreme Court recently reaffirmed this holding in *Oregon v. Bradshaw,* —— U.S. ——, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (plurality opinion), finding that the defendant's *Miranda* rights had not been violated and that in fact he had initiated the conversation with the police. In *Bradshaw,* the Court stated that "[t]here can be no doubt in this case that in asking, 'Well, what is going to happen to me now?', respondent 'initiated' further conversation in the ordinary dictionary sense of that word." —— U.S. at ——, 103 S.Ct. at 2835. As this Court noted in *Radovsky v. State,* 296 Md. 386, 464 A.2d 239 (1983), the Supreme Court in *Bradshaw* "stated that a 'generalized discussion relating . . . to the investigation' did constitute the initiation of conversation in the *Edwards* sense . . . ." 296 Md. at 401, 464 A.2d 239.

■ Bowers initiated the conversation with police after his telephone call. Nothing prohibited the police from merely listening to what he had to say. There was no interrogation within the meaning of *Miranda.*

## B

■ Bowers contends "that his extrajudicial statements should have been suppressed because the Maryland State Police did not have the requisite probable cause to arrest him, and thus interrogate him, in connection with the death of Monica McNamara prior to his interrogation." It must first be noted that at the time the Maryland State Police first interrogated Bowers he was not under arrest by them in connection with the death of Monica McNamara. He was under arrest by Virginia authorities for defrauding an innkeeper. Bowers says that when the trooper interviewed him the trooper "simply knew that [Bowers] had used Monica McNamara's credit card to pay for a room in the Ramada Inn one week after her death."

Bowers relies upon *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), and *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Those cases deal with illegal arrests. There simply was no illegal arrest here. The Virginia authorities were fully justified in their arrest of Bowers. Maryland police were fully justified in interrogating Bowers, then held in lawful custody by Virginia authorities, relative to his possession of credit cards belonging to the victim of the crime in the case at bar.

## III

Bowers claims that the trial court erred in admitting evidence that someone named Alexander Peterson was incarcerated in Illinois at the time of the crime. As he puts it in his brief:

"According to the police, Appellant had in his statement placed primary responsibility for the crime on Alexander Peterson who was 'on the run from Chicago.' The state introduced records showing that an Alexander Peterson had been incarcerated in Illinois since November 23, 1979."

Trooper Hornung testified that during the questioning of Bowers in Virginia Bowers told him that he had an accomplice, Alexander Peterson, who was traveling with Bowers, participated in the rape and was actually the one who strangled the victim to death. Bowers argues, "Since there was no link between the prosecutor's Alexander Peterson and the one in the confession, the evidence should have been excluded."

1 *Wharton's Criminal Evidence* § 103 (C. Torcia 13th ed. 1972) states:

"Identical names give rise to a presumption of identity of person. This presumption is slight when the name is common and there are many persons having the same name. It increases in strength with circumstances indicating the improbability of there being two persons of the same name at the same time and place, and where there is no evidence that there is any other person bearing that

name. Identity, then, can be presumed from names coupled with other circumstances. There is some case law to the effect that the identity of names alone gives rise to a rebuttable presumption of identity of person." *Id.* at 180. This same passage was cited with approval in *Murphy v. State,* 47 Md.App. 387, 422 A.2d 1297 (1980), *cert. denied,* 289 Md. 738 (1981), and *Sallie v. State,* 24 Md.App. 468, 332 A.2d 316 (1975).

By giving the police the name of Alexander Peterson who, Bowers said, was "on the run from Chicago," Bowers forced police to attempt to locate this alleged accomplice. When Peterson was located in an Illinois prison, a presumption of identity of persons arose. It then became the province of the jury to weigh the evidence in determining whether the Alexander Peterson who was located in Illinois was the same one referred to by Bowers. As stated in *Thomas v. State,* 32 Md.App. 465, 477, 361 A.2d 138 (1976), "[I]t is for the jury to pick and sift, to stress and ignore, to believe and disbelieve, to weigh and assess, and resolve the conflicts in reaching a final decision to acquit or convict." The surname of the alleged accomplice was not as common as Brown, Johnson, Jones, or Smith, nor was the given name as common as Charles, Henry, John, or William. The evidence was admissible. The jury simply chose to believe the State's contention that the Alexander Peterson to whom Bowers referred was not involved in the commission of the crime in the case at bar. Bowers was not denied the opportunity to offer contrary evidence to disprove the State's assertion or to argue in closing that the Alexander Peterson presented by the State was not the same Alexander Peterson to whom Bowers referred.

■ Bowers also contends that the Peterson record was inadmissible because its existence was not made known to the defendant pursuant to his motion for discovery under Maryland Rule 741. The State contends and the trial judge found, relying upon Code (1974, 1980 Repl.Vol.) § 10–204, Courts and Judicial Proceedings Article pertaining to admis-

sibility of public records, that the record was admissible as a public record. If we were to assume, arguendo, that there was error on this point, the error would be harmless beyond a reasonable doubt, *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976), because Bowers knew of the State's use of this record well in advance of the trial in the case at bar. He knew this because of the State's use at his kidnapping trial in the Circuit Court for Talbot County. That conviction was affirmed by the Court of Special Appeals in *Bowers v. State* (unreported), No. 1300, September Term, 1982, decided May 19, 1983, *cert. denied,* 297 Md. 310 (1983).

## IV

Bowers claims that the trial judge erred in refusing to admit into evidence the entire crime laboratory report completed by an expert witness for the State. One of the State's witnesses was Robert Radnoti, a forensic chemist with the Maryland State Police crime laboratory. Radnoti was involved in the analysis of items taken from the victim's automobile. After qualifying him as an expert, the State exhibited to Radnoti a piece of vinyl. He was asked whether he had ever seen it before. He said that he had. He indicated it was a part of the evidence in the Bowers case. Radnoti was asked whether he had had occasion to analyze the stain that appears on that piece of vinyl. He replied that he did. In response to the next succeeding question he stated, "It is a blood stain and it was identified as group A human blood." The State asked no further questions.

Bowers' attorney asked to see the report from which Radnoti was testifying. He then asked that the report be introduced into evidence. The State objected to the admission of anything other than that portion relevant to its questioning on direct examination concerning the vinyl, the blood, and the blood type. The trial judge sustained the objection. Over the further objection of the State, however, Radnoti was required to set forth the very extensive list of items which he received. Subsequently, defense counsel

attempted to question the witness on specific items. The State objected and the objection was sustained. In discussion at the bench it was suggested to defense counsel that he should call Radnoti as his own witness if he wanted the evidence admitted. He declined.

Bowers contends here:

"The testimony of the witness concerning one isolated piece of information contained in the report allowed the prosecution to create the appearance that the report conclusively and unquestionably linked Appellant to the crime scene. This one fact in isolation provided an aura of certainty to this conclusion which the entire report, had it been admitted, would not have supported. The report reveals that much of the evidence examined either did not relate to the Appellant or could not with certainty be said to relate to him.

"Maryland has long recognized the principle that '[t]he offer in testimony of a part of a statement or conversation, upon a well-established rule of evidence, always gives to the opposite party the right to have the whole.' *Smith v. Wood,* 31 Md. 293, 296–97 (1869). *Wigmore on Evidence,* 3rd Ed., Vol. VII, § 2113 states the principle this way:

'[T]he opponent, against whom a part of an utterance has been put in, may in his turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance.... [T]here is and could be no difference of opinion as to the *opponent's right,* if a part only has been put in, himself to *put in the remainder.*' " (Emphasis in original.)

Citing *Feigley v. Balto. Transit Co.,* 211 Md. 1, 10, 124 A.2d 822 (1956), he relies also on the verbal completeness doctrine.

What took place here is not comparable or analogous to the admission of a part of a statement or conversation, which requires that the whole statement or conversation be admitted. It would be comparable if only a part of the

analysis concerning the blood stains had been admitted into evidence.

In *Feigley* Chief Judge Brune discussed the verbal completeness doctrine for the Court. He concluded by quoting from 7 J. Wigmore, *Evidence* § 2113 (1940):

" 'This right of the opponent to put in the remainder is universally conceded, for every kind of utterance without distinction; and the only question can be as to the scope and limits of the right.

" 'The ensuing controversies are in effect concerned merely with drawing the line so that the opponent shall not, under cloak of this conceded right, put in utterances which do not come within its principle and would be otherwise irrelevant and inadmissible. In the definition of the limits of this right, there may be noted three general corollaries of the principle on which the right rests, namely:

"(a) *No utterance irrelevant to the issue is receivable;*

"(b) *No more of the remainder of the utterance than concerns the same subject, and is explanatory of the first part,* is receivable;

"(c) *The remainder* thus received merely *aids in the construction of the utterance as a whole,* and is not in itself testimony.' " 211 Md. at 10, 124 A.2d 822 (emphasis in original).

*See also McCormick on Evidence* § 56 (Cleary 2d ed. 1972).

■ The crime laboratory report does not fit within this framework. With the exception of that part of the report dealing with the blood stains on the piece of vinyl, the report is irrelevant to the issue brought out on direct examination concerning the blood stain. The remainder of the report in no way explains the stains on the vinyl but consists of the results of numerous other tests done on many other articles taken from the vehicle Bowers was operating. The remainder of the report would in no way aid in the construction of the testimony elicited from Radnoti. We emphasize that the State never sought admission of any part of the report.

We find no error on this point.  As Judge Levine observed for the Court in *Caldwell v. State,* 276 Md. 612, 618, 349 A.2d 623 (1976), "[T]he scope of cross-examination, . . . is a matter which rests largely within the reasonable discretion of the trial judge."  (Citing cases.)

## V

██  Bowers claims the trial judge erred in admitting eleven photographs "on the theory that they were admissible as part of the post-mortem report."  He recognizes, as he must, that Code (1957) Art. 22, § 8, applicable to this proceeding (now Code (1982) § 5–311, Health-General Article), provides that "records of the results of views and examinations of or autopsies upon the bodies of deceased persons" by the "medical examiner, or by anyone under his direct supervision or control" shall be admissible in evidence.  Bowers contends that photographs are not mentioned and thus are not part of the record.  It is obvious that the photographs here were integral parts of the record.  Aside from that, a virtually identical issue was before the Court in *Cook v. State,* 225 Md. 603, 171 A.2d 460 (1961), *cert. denied,* 368 U.S. 970, 82 S.Ct. 445, 7 L.Ed.2d 398 (1962).  The issue there before the Court concerned photographs of the body as originally seen by the medical examiner at the apartment of the deceased.  Judge Prescott said for the Court:

"The appellant argues that 'the conclusion is inescapable that the photographs of the deceased were inflammatory and were such as to create prejudice against the defendant.'  However, he fails, utterly, to show in what manner the photographs tended to create prejudice against him.  The exhibits were simple photographs of the body of the deceased showing a single gunshot wound in the upper right chest, which had been described by the Coroner.  It is difficult to discern how photographs of this simple nature were 'inflammatory,' or 'were such as to create [legal] prejudice against the defendant.'  Whether or not a photograph is of practical value in a case is within the sound discretion of the trial court, whose decision thereon

will not be disturbed unless plainly arbitrary. *Corens v. State,* 185 Md. 561, 570, 45 A.2d 340 [ (1946) ]; *Consolidated Gas, etc., Co. v. Smith,* 109 Md. 186, 199, 72 A 651 [ (1909) ]. Cf. *Madison v. State,* 200 Md. 1, 7–8, 87 A.2d 593 [ (1952) ]. We find no abuse of discretion in admitting the photographs." 225 Md. at 608 (bracket in original). *See also Perry v. State,* 234 Md. 48, 54, 197 A.2d 833 (1964); *Carroll v. State,* 11 Md.App. 412, 414, 274 A.2d 677, *cert. denied,* 262 Md. 745 (1971). We find no abuse of discretion on the part of the trial judge.

## VI

Bowers asserts that the admission of the autopsy report unaccompanied by the testimony of the medical examiner who prepared it violates his constitutional right to confront witnesses against him. He claims that in admitting the autopsy report the trial judge appears only to have considered the hearsay aspect of this record and did not examine whether its admission violated Bowers' Sixth Amendment right to confrontation of witnesses.

The identical issue was considered in *Grover v. State,* 41 Md.App. 705, 398 A.2d 528 (1979). There, too, the State was allowed to introduce the autopsy report which contained a statement by a doctor who did not testify at trial. In *Grover* the appellant relied on *Gregory v. State,* 40 Md.App. 297, 391 A.2d 437 (1978), arguing "that his Sixth Amendment right of confrontation was violated by the introduction of a document prepared in whole or in part by a party not present in court to testify." 41 Md.App. at 710, 398 A.2d 528. Judge Thompson said for the court:

"In *Gregory v. State, supra,* we noted that the field of forensic psychiatry was an inexact science and that differences of opinion frequently existed between experts in the field. This being so, we concluded that the opportunity to cross-examine a witness giving such opinion evidence could be of crucial importance. It should not be supposed that *Gregory* stands for the proposition that the confrontation clause of the constitution precludes the admission of

all evidence under exceptions to the hearsay rule. Dr. Azzarelli's statement in the autopsy report did not express any opinion. It merely stated his findings of the physical condition of the decedent's brain. As such it falls under the category of a 'fact or condition objectively ascertained,' and was probably admissible as a business record as provided by the *Md.Code,* Courts and Judicial Proceedings Article, Section 10–101. It was clearly admissible under *Md.Code,* Article 22, § 8 which has been construed by *Benjamin v. Woodring,* 268 Md. 593, 608, 303 A.2d 779 (1973) to make autopsy reports admissible as to facts, but not as to opinions." 41 Md.App. at 710–11, 398 A.2d 528 (footnote omitted).

■ As in *Grover,* the autopsy report here merely stated findings as to the physical condition of the victim. The only thing that comes near to an opinion in the report are its final two sentences which state, "In view of the history and findings at autopsy, the death of MONICA MCNAMARA, a twenty-eight year old White female, is attributed to strangulation. The manner of death is HOMICIDE." Although it was only the opinion of the medical examiner that this was a homicide, there has never been any dispute but what it was. Moreover, Bowers admitted that she was strangled.

The autopsy report here was admissible without the testimony of the physician who prepared it.

### VII

### A

Bowers claims that the trial court erred in denying his motion to suppress evidence obtained from the vehicle of Bessie Crain, which Bowers operated, at the time of his apprehension. He asserts that "the warrantless search of Bessie Crain's automobile on August 2, 1981, cannot be justified under the so-called 'automobile exception' because there was no exigency." He says that "[h]e had helped to pay for the car, done most of the maintenance, and purchased new tires and a new transmission during the preced-

ing year." Accordingly, he argues that "his use was authorized at the time of the search [and] he had the requisite standing to object." He recognizes that under *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), and *Gahan v. State*, 290 Md. 310, 430 A.2d 49 (1981), it must be shown that he had a legitimate expectation of privacy in the area searched for him to be successful in his contentions.

■ Bowers declined to offer any evidence on the issue of the search of the vehicle. Mrs. Crain testified that it was used without her permission, that she actually had a warrant out for Bowers because of his unauthorized use of the vehicle, and that "he wanted [her] to stop the warrant." She said that the sum invested by Bowers in the vehicle was without her permission and that she told him that the "parts" he wanted put on the vehicle she "didn't want on [her] car but [Bowers] put them on there anyway."

The trial judge said:

"The evidence introduced at the hearing established that the defendant had taken the car without the owner's permission, and that he had no proprietary or rightful possessory interest in the car. As the State contends, the defendant lacks standing to challenge the search and seizure of the vehicles [sic] and items found therein."

We perceive no error.

## B

Bowers argues:

"Appellant submits that the warrantless search of his room was also unreasonable. He had a reasonable expectation of privacy in the motel room. *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). Although the search was conducted by a private citizen, she was in effect operating as an agent of the State of Virginia. *But see Herbert v. State*, 10 Md.App. 279, 269 A.2d 430 (1970) [*cert. denied*, 260 Md. 720 (1971)]. Cowell's authority to enter Appellant's room and seize his

belongings was dependent upon her status as an innkeeper licensed by the State. If she were not a state agent, she would not have held Appellant's property for the police."

A search of Bowers' motel room was conducted by the accounting supervisor of the Ramada Inn the morning after Bowers was arrested for attempting to defraud an innkeeper. She explained that "before the maid can get in to clean, somebody has to say there are no belongings there." She further testified that any items found would be kept by the motel until the bill was paid. Bowers offered no evidence on the issue. The trial judge said:

"The testimony of two hotel employees established that the items were removed from the room by one of the employees as part of a customary procedure of the hotel. The Fourth Amendment's proscription against illegal searches and seizures applies only to conduct of governmental officers or their agents, and not to private citizens who are not acting for the State. *Burdeau v. McDowell,* 256 U.S. 465 [, 41 S.Ct. 574, 65 L.Ed. 1084] (1921); *Coolidge v. New Hampshire,* 403 U.S. 443 [, 91 S.Ct. 2022, 29 L.Ed.2d 564] (1971)."

The law as applied to private persons, such as the hotel employee in the case at bar, who conduct warrantless searches and seizures is as stated by Judge Orth for the Court of Special Appeals in *Herbert v. State,* 10 Md.App. 279, 269 A.2d 430 (1970), *cert. denied,* 260 Md. 720 (1971):

"We believe that by history, judicial rule and application, the exclusionary rule as to evidence seized in violation of the Fourth Amendment comes into play only when the evidence is obtained by governmental action. Whatever wrong is done by the act of one individual in taking the property of another, it is no invasion of the security afforded by the Fourth Amendment against unreasonable searches and seizures. *Burdeau v. McDowell,* [256 U.S. 465,] at 475 [41 S.Ct. 574 at 576]. When an individual obtains incriminatory matter from an accused, no matter how improperly, and such matter comes into the possession of the government without a violation of the ac-

cused's rights by governmental authority, the exclusionary rule does not prohibit its use at trial." 10 Md.App. at 284–85, 269 A.2d 430 (footnote omitted).

■ The accounting supervisor is a private person, not an agent of the government. The fact that the motel had a state business license did not make her an agent of the State of Virginia. Therefore, the search and seizure by her does not necessitate suppression of the evidence in question.

## VIII

■ Bowers argues that the trial court erred in denying his motion to dismiss on the grounds of double jeopardy. He was convicted in the Circuit Court for Talbot County on April 7, 1982, of kidnapping. Those charges originated in Worcester County and grew out of the same incident. Bowers points out that in *Newton v. State,* 280 Md. 260, 373 A.2d 262 (1977), we held that "conviction of both 'felony-murder' and the underlying felony arising from the same incident violates the prohibition against double jeopardy." He says:

"In the case at bar, the State attempted to avoid the problem by trying Appellant for 'premeditated' first degree murder. The difficulty is that there is only one crime of first degree murder.

'When by Ch. 138 of the Acts of 1809 the Legislature divided the crime of murder as it was known at common law into first and second degrees and attached penalties therefor, no new statutory offense was created.' *Gladden v. State,* 273 Md. 383, [389–90,] 330 A.2d 176 (1974).

"Thus, an indictment charging premeditated, deliberate and willful murder is sufficient to charge felony-murder. *Wood v. State,* 191 Md. 658, 666–667, 62 A.2d 576 (1948)."

Bowers says, "It was thus improper for the State to try Appellant for murder—whether called premeditated or felony-murder—after it had convicted him of kidnapping."

Bowers overlooks what we said in *State v. Frye,* 283 Md. 709, 393 A.2d 1372 (1978), where we were confronted with a similar problem. Judge Eldridge there said for the Court:

"Although we held in *Newton* that felony murder and the underlying felony are to be considered one offense for purposes of multiple punishment, and therefore the underlying felony would merge into the felony murder conviction, we also emphasized that if a first degree murder conviction is premised upon independent proof of wilfulness, premeditation and deliberation under Art. 27, § 407, then the murder, even though committed in the course of a felony, would not be deemed the same offense as the felony, and there would be no merger. 'Each offense would then require proof of facts which the other did not, and convictions of both would be proper.' *Newton v. State, supra,* 280 Md. at 269 [373 A.2d 262]." 283 Md. at 716, 393 A.2d 1372.

Felony murder was not argued to the jury. The jury was not instructed on felony murder. It is apparent that Bowers was convicted of first degree murder under Code (1957) Art. 27, § 407 pertaining to murder "perpetrated by means of poison or lying in wait, or by any kind of wilful, deliberate and premeditated killing" and not under Code (1957, 1982 Repl.Vol.) Art. 27, § 410 pertaining to murder "committed in the perpetration of, or attempt to perpetrate, any rape in any degree, sexual offense in the first or second degree, sodomy, mayhem, robbery, burglary, kidnapping as defined in §§ 337 and 338 of [Art. 27], storehouse breaking as defined in §§ 32 and 33 of [Art. 27], or daytime housebreaking as defined in § 30(b) of [Art. 27]," etc. In his instructions to the jury the trial judge carefully explained exactly what first degree murder was, that it requires independent proof of willfulness, premeditation and deliberation. He told the jury:

"Now, murder is divided in two degrees. We have murder in the first degree and again we have murder in the second degree. And the distinction between first degree murder and second degree murder is based on the elements of premeditation and deliberation.

"All murders that shall be perpetrated by the means of poison, or lying in wait, or any kind of willful, deliberate

and premeditated killing shall be murder in the first degree.

"For a homicide to be willful there must be a specific purpose and design to kill. Willful means with intentional purpose as distinguished from an act or negligent act.

"An act you don't have the intent to kill, a negligent act you don't have the intent to kill. To be premeditated the design to kill must have preceded the killing by an appreciable length of time. That is there must be time enough to deliberate about what you are doing.

"Premeditation, as an element of murder, means planned or contrived as a scheme ahead of time for the commission of the fatal act.

"To be deliberate there must be a full and conscious knowledge of the purpose to kill.

"Deliberation as an element of murder means acting in a cool state as opposed to a heated state.

"Deliberation implies reflection, however brief.

"There is no specific length of time required for that deliberation, but there must be reflection, must be time for reflection upon the act before committing it.

"Deliberation implies a fixed and determined purpose as distinguished from a sudden impulse.

"Deliberation is evidenced by choice, determination or due thought about the law or what you are doing.

"Now, first degree murder, in essence, is killing in cold blood after having calculated the circumstances.

"You must find from the evidence the actual intent and the fully informed purpose to kill.

"There cannot be first degree murder if the killing is the offspring of rashness or impetuous temper where the mind had not become fully conscious of its own design.

"The State must prove beyond a reasonable doubt that the homicide was willful, deliberate and premeditated in order to convict of murder in the first degree.

"It must be willful, intentional killing, deliberate, time to reflect, premeditated, again thinking with design to kill."

During the jury's deliberations the trial court received a note from the jury requesting a further explanation of the differences between first degree and second degree murder. In response to that inquiry the jury was instructed in part:

"And the difference between first degree and second degree murder is this: First degree you must find there was premeditation and deliberation. The thinking and the time to think. It is not any set length of time but you must have time to think about it and there must be, under circumstances that you would think about the killing. So that is the difference between first degree and second degree."

The trial judge's instructions to the jury concerning first degree murder were adequate. Felony murder was never mentioned. By returning a guilty verdict on first degree murder the jury demonstrated that the conviction was premised upon independent proof of willfulness, premeditation and deliberation under Art. 27, § 407. Hence, the contention relative to double jeopardy must fall.

### IX

Bowers contends that the trial court erred "in refusing to voir dire the jury thoroughly about their views on capital punishment." This is based upon the refusal of the trial judge to use question "24" submitted by Bowers. That question was:

"24. In this particular case, the jurors will be asked to decide the guilt or innocence of the Defendant. If the jury should find the Defendant guilty of murder in the first degree, the jury may be asked to decide whether the court shall impose a sentence of life imprisonment. Therefore, I want to ask you about your views on capital punishment.

"(a) Do you believe in the death penalty? If so, why?

"(b) What types of crimes do you feel deserve the death penalty?

"(c) Do you believe that the death penalty is a deterrent to crime?

"(d) Do you believe that a sentence of life imprisonment adequately protects society from a person who commits murder?

"(e) Do you feel that a sentence of life imprisonment is too light a sentence for the crime of murder?

"(f) Would you be concerned that, if the Defendant were sentenced to life imprisonment, the taxpayers would have to feed and house that person for the rest of his life?"

The trial judge inquired instead:

"Would your attitude toward the death penalty prevent you from making an impartial decision as to the Defendant's guilt or innocence of the offense or the charge of murder?

Bowers contends that under *Casey v. Roman Catholic Arch.*, 217 Md. 595, 605, 143 A.2d 627 (1958), he is entitled to have questions asked "which are directed to a specific cause for disqualification . . . ." He suggests that he "sought to elicit jury attitudes toward capital punishment. The question the Court asked elicited only whether jurors would have scruples making them reluctant to impose capital punishment." He claims that his "question would have revealed whether any juror was biased in favor of capital punishment, thus presenting grounds for challenge for cause."

The trial judge refused to ask this question, stating: "What happens if I ask a person do you believe in the death penalty, if so why, and I then ask him whether or not that would have any effect on his reaching a fair and impartial verdict based on the evidence in the case. Suppose he is opposed to capital punishment. And he says that that would have an effect on his reaching a fair and impartial verdict based on the evidence in the case.

"Aren't you, in effect, eliminating from your panel jurors who are opposed to capital punishment? Because if the juror says it would affect his decision, aren't you to disqualify him? From sitting on the panel? In other words, if a juror tells me he can't give a fair and impartial decision because he is opposed to capital punishment, shouldn't I disqualify him? In effect, aren't you in question number 24 asking me to do what the statute says I am not supposed to do? Disqualify a juror because of his view or opposition to capital punishment?"

After all the proposed questions had been discussed the trial judge asked defense counsel if he wished to except to any of the court's rulings on the questions. Exceptions were taken on two points, one dealing with whether the word "guilt" should be used alone or in the phrase "guilt or innocence," and the other dealing with the trial judge's refusal to question the jurors concerning the religious beliefs. No exception ever was taken to the trial judge's ruling on the capital punishment question. Thus, the point is deemed waived. However, the trial judge was correct in his ruling. Code (1974) § 8–210(c), Courts and Judicial Proceedings Article states:

"*Belief against capital punishment.*—A person may not be disqualified, excused, or excluded from service in a particular case as a juror of the State by reason of his beliefs against capital punishment unless such belief would prevent his returning an impartial verdict according to law."

This Court has observed on a number of occasions that there is no statute in Maryland prescribing the objects of inquiry in determining the eligibility of jurors, and the subject is not covered by rigid rules, but is committed largely to the sound discretion of the trial court in each case. *See, e.g., Casey,* 217 Md. at 605, 143 A.2d 627; *Corens v. State,* 185 Md. 561, 564, 45 A.2d 340 (1946); *Whittemore v. State,* 151 Md. 309, 314, 134 A. 322 (1926). Judge Hammond explained for the Court in *McGee v. State,* 219 Md. 53, 146 A.2d 194 (1959):

"It is settled in Maryland that in examination of jurors on their *voir dire,* the court may frame its own questions and not permit cross-examination by counsel, that the extent of the examination rests in the sound discretion of the court, and that the purpose of the inquiry is to ascertain 'the existence of cause for disqualification and for no other purpose.' *Adams v. State,* 200 Md. 133, 140, [88 A.2d 556 (1962)] and cases cited; *Bryant v. State,* 207 Md. 565 [, 115 A.2d 502 (1955)]. Questions not directed to a specific ground for disqualification but which are speculative, inquisitorial, catechising or 'fishing', asked in aid of deciding on peremptory challenges, may be refused in the discretion of the court, even though it would not have been error to have asked them. *Whittemore v. State,* 151 Md. 309, 311–316 [134 A. 322]; *Handy v. State,* 101 Md. 39 [, 60 A. 452 (1905)]; *Gillespie v. State,* 92 Md. 171, 174 [, 48 A. 32 (1900)]; *Emery v. F.P. Asher, Jr. & Sons, Inc.,* 196 Md. 1, 6–9 [, 75 A.2d 333 (1950)]; Cf. *Casey v. Roman Catholic Archbishop,* 217 Md. 595, 605 [143 A.2d 627]." 219 Md. at 58–59, 146 A.2d 194.

*See also Grogg v. State,* 231 Md. 530, 532, 191 A.2d 435 (1963); *Giles v. State,* 229 Md. 370, 378, 183 A.2d 359 (1962), *appeal dismissed,* 372 U.S. 767, 83 S.Ct. 1102, 10 L.Ed.2d 137 (1963); *Casey,* 217 Md. at 605, 143 A.2d 627; *Grossfeld v. Braverman,* 203 Md. 498, 500–01, 101 A.2d 824 (1954); *Adams, Nelson, and Timanus v. State,* 200 Md. 133, 140, 88 A.2d 556 (1952); *Cohen v. State,* 173 Md. 216, 224, 195 A. 532 (1937), *cert. denied,* 303 U.S. 660, 58 S.Ct. 764, 82 L.Ed. 1119 (1938). In *Casey* Judge Horney said for the Court:

"[P]arties to an action triable before a jury have a *right* to have questions propounded to prospective jurors on their *voir dire,* which are directed to a specific cause for disqualification, and failure to allow such questions is an abuse of discretion constituting reversible error." 217 Md. at 605, 143 A.2d 627 (emphasis in original).

He then referred to *Bryant v. State,* 207 Md. 565, 115 A.2d 502 (1955), where Judge Delaplaine said for the Court:

"In the exercise of that discretion, the trial judge should adapt the questions to the needs of each case in the effort to secure an impartial jury. Any circumstances that may reasonably be regarded as rendering a person unfitted for jury service may be made the subject of questions and a challenge for cause. Accordingly an examination of a juror on his *voir dire* is proper as long as it is conducted within the right to discover the juror's state of mind in respect to the matter in hand or any collateral matter reasonably liable to unduly influence him. *Corens v. State,* 185 Md. 561, 564, 45 A.2d 340; *Grossfeld v. Braverman,* 203 Md. 498, 101 A.2d 824." 207 Md. at 583, 115 A.2d 502.

None of the questions proposed by Bowers would give any indication of the inability of a juror either to follow the law or to abide by his oath as a juror. The questions sought by Bowers did not provide grounds for disqualification. The question propounded by the trial judge on the issue of the death penalty adequately covered the matter. It was well within the trial judge's discretion to decide that Bowers' proposed jury question on capital punishment would result in excluding from the panel people who by statute are not to be excluded.

## X

Bowers argues "that his conviction for murder in the first degree must be reversed because he was denied his common law and constitutional right to be tried on an indictment in a capital case." He says that the Fifth Amendment to the Constitution of the United States "expressly provides that 'no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury.'" He argues that this is applicable to the states through the Fourteenth Amendment under *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), pertaining to the double jeopardy clause, and *Gardner v. Broderick,* 392 U.S. 273, 88 S.Ct. 1913,

20 L.Ed.2d 1082 (1968), pertaining to the privilege against self-incrimination.

This Court pointed out in *Heath v. State,* 198 Md. 455, 464, 85 A.2d 43 (1951), that there is no constitutional provision expressly guaranteeing a right to trial upon indictment in this State. The Supreme Court in *Hurtado v. California,* 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884), held that the Fourteenth Amendment does not necessarily require a grand jury indictment in prosecution by a state for murder. What Judge Scanlan said for the Court of Special Appeals in *Kable v. State,* 17 Md.App. 16, 299 A.2d 493, *cert. denied,* 268 Md. 750 (1973), is applicable here:

"The appellant, however, would have us anticipate the Supreme Court of the United States. He argues that authority of *Hurtado v. California,* 110 U.S. 516 [4 S.Ct. 111, 28 L.Ed. 232] (1884) has been eroded by more recent Supreme Court decisions. In *Hurtado,* the Court held that the Fourteenth Amendment did not require that State criminal prosecutions be initiated by grand jury indict- ment. The Supreme Court has consistently adhered to *Hurtado.* The last clear expression of its continuing agreement with the rule of that case came in *Beck v. Washington,* 369 U.S. 541, 545 [, 82 S.Ct. 955, 957–958, 8 L.Ed.2d 98] (1962).

"The appellant, nevertheless, claims that the Supreme Court by its recent decision in *Benton v. Maryland,* 395 U.S. 784 [89 S.Ct. 2056, 23 L.Ed.2d 707] (1969) has given a signal suggesting that the Court ultimately will overturn *Hurtado* and extend the Fifth Amendment grand jury right to the States through application of the Due Process Clause of the Fourteenth Amendment. In *Benton,* the Court held that the double jeopardy prohibition of the Fifth Amendment represented a notion that was 'funda- mental to the American scheme of justice,' and that the prohibition was enforceable against the States through the Fourteenth Amendment. *Id.* at 796 [89 S.Ct. at 2063].

"We eschew speculation on our part as to whether a majority of the present members of the Supreme Court of

the United States might hold, despite the precedent of *Hurtado,* that the Fifth Amendment grand jury indictment right is 'fundamental to the American scheme of justice' and thus binding on the States through application of the Due Process Clause of the Fourteenth Amendment. We point out, however, that the grand jury was abolished in England in 1933 and that at the present time only half of the States use the grand jury as a regular adjunct of criminal prosecutions.[1] We also observe that, unlike the prohibition against double jeopardy, the requirement of trial by jury and other procedural protections of the Bill of Rights which operate for the protection of a defendant in a criminal case, the grand jury often has been an instrument more for the benefit of the prosecution than of the defendant and, indeed, not infrequently has operated to a defendant's severe detriment.[2] " 17 Md.App. at 26–27, 299 A.2d 493.

The footnotes referred to Doub, *"Is the Grand Jury an Anachronism?,"* Md.B.J., October 1971, at 4.

We have no indication from the Supreme Court that *Hurtado* does not continue to be good law. Accordingly, we reject this contention.

## XI

Bowers argues that "the trial court abused its discretion in denying [his] request for a mistrial following the introduction of 'perjured' testimony." It is Bowers' contention that Trooper Hornung said one thing at the kidnapping trial in Talbot County and something else at the murder trial in Charles County. We have carefully examined the record. The testimony of Trooper Hornung at the murder trial is consistent with that at the kidnapping trial introduced as an exhibit by Bowers in this case. Moreover, it is consistent with Bowers' own testimony at the suppression hearing in the kidnapping trial. We find this contention to be frivolous.

## XII

Bowers claims that the trial court erred in admitting into evidence during the sentencing proceeding evidence of his prior convictions which he says were "invalid on the face of the record."

At the sentencing hearing the State introduced into evidence certified copies of docket entries showing Bowers' conviction in Delaware for possession of a deadly weapon during commission of a felony, possession of a destructive weapon, and assault in the second degree. Each of the certified copies of docket entries shows a sentence on July 30, 1976, and that on August 10, 1979, there was a hearing on a petition for writ of habeas corpus with the writ granted and "Defendant . . . released." Bowers points to *Biddle v. Board of Trustees,* 33 Del. 425, 138 A. 631 (1927), where the Supreme Court of Delaware said:

"It seems that the grounds on which the court will give relief on habeas corpus in a case of this kind is where there is want of jurisdiction over the person or cause or some other matter rendering the proceeding void, as distinguished from what is merely erroneous." 138 A. at 633.

From this the argument is made, "[I]t is obvious that after a petitioner in Delaware has been freed on a writ of habeas corpus, the underlying conviction can no longer be presumed valid."

Bowers has not told us the whole story. As the docket entries reflect, his convictions were affirmed on appeal by the Supreme Court of Delaware. That opinion apparently is not reported. The docket entries further reflect that he sought postconviction relief. This was denied. He appealed to the Supreme Court of Delaware. It affirmed. That opinion is reported. *See Bowers v. State,* 396 A.2d 962 (Del.1978). It is after this that the writ of habeas corpus was issued. The docket entry relative to habeas corpus is the last appearing on the possession of deadly weapon during commission of a felony charge. However, the docket entries relative to possession of a destructive weapon show

that on May 12, 1980, there was a hearing on a charge of violation of probation with a decision made to continue on probation. They further show that on October 7, 1981, Bowers was discharged from probation. The docket entries relative to assault in the second degree also reflect a hearing on May 12, 1980, concerning violation of probation with Bowers to continue on probation. No discharge from probation is shown. It will be noted that these entries relative to probation are subsequent to that concerning habeas corpus. Hence, it does not appear that the Delaware courts regard the convictions as void. No doubt on the remand the State will clarify by showing the reason the docket entries read as they do relative to habeas corpus.

## XIII

■ Bowers contends that the jury erred in failing to find the mitigating factor of no prior conviction of a crime of violence. It appears that he is correct as a matter of law.

Code (1957, 1982 Repl.Vol.) Art. 27, § 413(g) specifies that if the court or jury finds beyond a reasonable doubt that one or more aggravating circumstances set forth in the statute exist, the sentencing authority is then bound to "consider whether, based upon a preponderance of the evidence," any of certain specified mitigating circumstances exist. One of those mitigating circumstances is that a defendant has not previously been found guilty of a crime of violence. The statute goes on to define a crime of violence as meaning "abduction, arson, escape, kidnapping, manslaughter, except involuntary manslaughter, mayhem, murder, robbery, or rape or sexual offense in the first or second degree, or an attempt to commit any of these offenses, or the use of a handgun in the commission of a felony or another crime of violence."

The State argues that the Delaware convictions are evidence of his conviction of a crime of violence. It appears that in Delaware an assault in the second degree is a felony. Neither the Delaware convictions nor the record in this case

tell us whether a handgun was used in that crime. Although Bowers was convicted in Delaware of possession of a deadly weapon during commission of a felony, we know not what type of deadly weapon was involved. There are many deadly weapons other than handguns. Moreover, the State at the sentencing hearing conceded that Bowers had no prior record of conviction of a crime of violence. In his argument to the jury the State's Attorney said:

"Now, with regards to the Section II of the form, the State is certainly not contending that this man has any prior conviction of the crime of violence set forth in this section. We are not saying he has a prior record of a crime of violence."

It thus follows that upon the facts adduced in the trial court Bowers was entitled to have the jury make a finding of this mitigating factor. *Johnson v. State,* 292 Md. 405, 440, 439 A.2d 542 (1982). Therefore, Bowers' sentence must be reversed and his case remanded for a new sentencing proceeding.

### XIV

Bowers raises several contentions which, in light of the fact that we are remanding the case for a new sentencing proceeding, we are not obliged to decide. However, in the interest of judicial economy we shall address two of those arguments for the guidance of the trial judge upon the remand.

### A

Bowers argues that "[t]he trial judge erred in not excluding from the jury's consideration rape or first degree sexual offense as an aggravating factor."

Code (1957, 1982 Repl.Vol.) Art. 27, § 462 defines first degree rape:

"(a) *What constitutes.*—A person is guilty of rape in the first degree if the person engages in vaginal intercourse

with another person by force or threat of force against the will and without the consent of the other person and:

"(1) Employs or displays a dangerous or deadly weapon or an article which the other person reasonably concludes is a dangerous or deadly weapon; or

"(2) Inflicts suffocation, strangulation, disfigurement, or serious physical injury upon the other person or upon anyone else in the course of committing the offense; or

"(3) Threatens or places the victim in fear that the victim or any person known to the victim will be imminently subjected to death, suffocation, strangulation, disfigurement, serious physical injury, or kidnapping; or

"(4) The person commits the offense aided and abetted by one or more other persons."

Section 464 sets forth what constitutes a first degree sexual offense:

"(a) *What constitutes.*—A person is guilty of a sexual offense in the first degree if the person engages in a sexual act:

"(1) With another person by force or threat of force against the will and without the consent of the other person, and:

"(i) Employs or displays a dangerous or deadly weapon or an article which the other person reasonably concludes is a dangerous or deadly weapon; or

"(ii) Inflicts suffocation, strangulation, disfigurement, or serious physical injury upon the other person or upon anyone else in the course of committing the offense; or

"(iii) Threatens or places the victim in fear that the victim or any person known to the victim will be imminently subjected to death, suffocation, strangulation, disfigurement, serious physical injury, or kidnapping; or

"(iv) The person commits the offense aided and abetted by one or more other persons."

A sexual act is defined in Art. 27, § 461(e):

"*Sexual act.*—'Sexual act' means cunnilingus, fellatio, analingus, or anal intercourse, but does not include vagi-

nal intercourse. Emission of semen is not required. Penetration, however slight, is evidence of anal intercourse. Sexual act also means the penetration, however slight, by any object into the genital or anal opening of another person's body if the penetration can be reasonably construed as being for the purposes of sexual arousal or gratification or for abuse of either party and if the penetration is not for accepted medical purposes."

At the sentencing proceeding defense counsel argued that there was a lack of evidence to establish either that rape or sexual offense in the first degree had occurred. The trial judge replied, "I think there is some evidence from which the jury can infer and they are entitled to make reasonable inferences from the evidence that has been introduced . . . ."

In *Tichnell v. State,* 287 Md. 695, 725–34, 415 A.2d 830 (1980), we held that the same standards apply in the sentencing phase of a capital punishment case as apply in the guilt or innocence phase. Earlier in that opinion we said that under *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), the standard to be applied in a review of the sufficiency of the evidence to support a criminal conviction is whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. We said this standard does not require a reviewing court to ask whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the standard to apply is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

In *Breeding v. State,* 220 Md. 193, 198, 151 A.2d 743 (1959), Judge Henderson said for the Court, "[T]he evidence is almost wholly circumstantial, but that is not a fatal objection." In *Gilmore v. State,* 263 Md. 268, 283 A.2d 371 (1971), a capital case, we said:

"We find relevant much of what was said by Judge Orth for the Court of Special Appeals in *Nichols v. State,* 5 Md.App. 340, 247 A.2d 722 (1968), where he said:

'The law makes no distinction between direct evidence of a fact and evidence of circumstances from which the existence of a fact may be inferred. No greater degree of certainty is required when the evidence is circumstantial than when it is direct, for in either case the trier of fact must be convinced beyond a reasonable doubt of the guilt of the accused. * * *

' * * * In considering the evidence the lower court was guided by established rules of law. Proof of guilt beyond all doubt has never been required. *Young v. State,* 4 Md.App. 286 [, 242 A.2d 562 (1968)]. To prove guilt beyond a reasonable doubt it is not necessary that every conceivable miraculous coincidence consistent with innocence be negatived. *Hayette v. State,* 199 Md. 140, 144 [, 85 A.2d 790 (1952)]. The lower court could weigh the evidence and determine the credibility of the witnesses. *Roeder v. State,* 4 Md.App. 705 [, 244 A.2d 895 (1968)]; *Gibson v. State,* 4 Md.App. 222 [, 242 A.2d 204 (1968)]. It was under no obligation to believe the appellant's denials or explanations. *Eley v. State,* 4 Md.App. 230 [, 242 A.2d 175 (1968)]; *Tillery v. State,* 3 Md.App. 142 [, 238 A.2d 125 (1968)]. It could weigh the alibi testimony and was not required to accept its truthfulness. *Logan v. State,* 1 Md.App. 213 [, 228 A.2d 837 (1967)]. And if we assume that the evidence against the appellant was solely circumstantial, such assumption would not change the result. The lower court could have properly found that the circumstances, taken together, were inconsistent with, or such as to exclude every *reasonable,* hypothesis or theory of innocence. "[C]ircumstantial evidence need not be such that no possible theory other than guilt can stand * * *. It is not necessary that the circumstantial evidence exclude every possibility of the defendant's innocence, or produce an absolute certainty in the minds of the jurors.

**156**

> The rule does not require the jury to be satisfied beyond a reasonable doubt of each link in the chain of circumstances relied upon to establish the defendant's guilt." 3 *Wharton's Criminal Evidence* (12th Ed.1955) § 980, p. 477. While it must afford the basis for an inference of guilt beyond a reasonable doubt, it is not necessary that each circumstance, standing alone, be sufficient to establish guilt, but the circumstances are to be considered collectively. 1 *Underhill's Criminal Evidence* (5th Ed. 1956) § 17, p. 23 and p. 25.' *Id.* at 350–51 (Emphasis in original)."

263 Md. at 292–93, 283 A.2d 371.

■ With that background we proceed to an examination of the evidence which was before the jury. The autopsy report established that sperm was present in the victim's vagina and anus at the time of her death. Moreover, the report showed evidence of anal lacerations and localized erythema. It conclusively established that she was strangled to death. Bowers' statement to Trooper Hornung was before the jury. He alleged that his friend Peterson had sexual intercourse with the victim. Bowers said at Peterson's invitation that he then had intercourse with her. After that, according to Bowers, Peterson re-entered the vehicle and again had sexual intercourse with the victim. The matter of Peterson is further discussed in III, *supra.* Given the evidence as to a woman's screams, the victim's forcible abduction, the presence of semen, the erythema, the manner of death, and Bowers' own statement, there clearly was sufficient evidence for a rational trier of fact to determine beyond a reasonable doubt that Bowers was guilty of rape or of first degree sexual offense as to this victim.

## B

■ Bowers argues that "[t]he trial court erred in instructing the jury on reasonable doubt during the sentencing proceeding." The instruction given was:

"Now, a reasonable doubt is a doubt that is founded upon reason. It is such a doubt as would cause a reasonable person to hesitate to act in the graver or more important transactions in his life.

"Thus, if the evidence is of a character as to persuade you of the truth of the charges against the Defendant, with the same force that would be sufficient to persuade you to act in the more important transactions in your life then you would conclude the State has proven aggravating circumstances beyond a reasonable doubt.

"If, on the other hand, you could not act based on that evidence in the more important transactions in your life, then you would conclude that the State had not met the burden of proof and therefore had not proven the aggravating circumstances."

Bowers excepted to the court's instruction:

"MR. REDDICK [Defense Counsel]: Your Honor, you said that if they find evidence sufficient to act in the more important, on which they would act in the more important transactions of their life to find the Defendant guilty, I would ask you to insert the words 'without hesitation and if they were to find evidence sufficient to act without hesitation in the more important transactions.'

"THE COURT: I think I have previously covered that when I said if your doubt is such as would cause you to hesitate in the more important transactions in your life then you would conclude that the burden of proof had not been met.

"MR. REDDICK: You did say that, Your Honor, I believe, but I think the way I am asking you to say it is different and it conveys a different thought.

"THE COURT: I think that covers it.

"I think you have got really what you want in there.

"Okay. You argue the hesitation point but I think I have covered it in the instruction."

Bowers claims that this instruction "conveys not the reasonable doubt standard but rather the 'preponderance of evidence' standard."

In *Lambert v. State,* 193 Md. 551, 69 A.2d 461 (1949), there was contention relative to the propriety of a reasonable doubt instruction. The Court said:

"After instructing the jury that the State must prove the commission of the crime beyond a reasonable doubt and to a moral certainty, the judge said: 'That doesn't mean, however, that the State must prove those elements of a crime to an absolute or mathematical certainty. It means such evidence as you would act upon in a matter involving important affairs in your life or your business or with regard to your property. If the evidence is sufficient that you would act upon it in a very important matter in your own lives, then it is sufficient to convict in a criminal case.' " 193 Md. at 558, 69 A.2d 461.

Judge Delaplaine said for the Court:

"In accordance with the rule followed by the Federal courts and by the great majority of the State courts in America, we hold that, after the judge in a criminal trial instructs the jury that the State must prove the charge beyond a reasonable doubt in order to convict, it is not erroneous to instruct the jury that evidence is sufficient to remove a reasonable doubt when it convinces the judgment of an ordinarily prudent man of the truth of a proposition with such force that he would act upon that conviction without hesitation in his own most important affairs." 193 Md. at 560–61, 69 A.2d 461 (citing numerous cases).

A similar issue was before the Supreme Court in *Holland v. United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954). The Court there addressed the issue of whether a jury instruction using the words "would be willing to act" and "would not hesitate to act" was correct in a criminal case where the prosecution must prove the defendant's guilt beyond a reasonable doubt. The trial judge had instructed

the jury that beyond a reasonable doubt is " 'the kind of doubt . . . which you folks in the more serious and important affairs of your own lives might be willing to act upon.' " 348 U.S. at 140, 75 S.Ct. at 138. Relative to that instruction the Court said:

"We think this section of the charge should have been in terms of the kind of doubt that would make a person hesitate to act, . . . rather than the kind on which he would be willing to act. But we believe the instruction as given was not of the type that could mislead the jury into finding no reasonable doubt when in fact there was some. A definition of the doubt as something the jury would act upon would seem to create confusion rather than misapprehension. 'Attempts to explain the term "reasonable doubt" do not usually result in making it any clearer to the minds of the jury,' *Miles v. United States,* 103 U.S. 304, 312, [26 L.Ed. 481 (1881),] and we feel that, taken as a whole, the instructions correctly conveyed the concept of reasonable doubt to the jury." 348 U.S. at 140, 75 S.Ct. at 138.

*Accord Jackson,* 443 U.S. at 317, n. 9, 99 S.Ct. at 2788, n. 9, citing *Holland* for the proposition that variations of jury instructions regarding the reasonable doubt standard may be used. *See also Montgomery v. State,* 292 Md. 84, 95, 437 A.2d 654 (1981). Legions of our cases have held that, when an objection is raised to a court's instruction, attention should not be focused on a particular portion lifted out of context, but rather on the jury instruction as a whole. *See, e.g., Poole v. State,* 295 Md. 167, 186, 453 A.2d 1218 (1983); *State v. Garland,* 278 Md. 212, 220, 362 A.2d 638 (1976); *State v. Grady,* 276 Md. 178, 185, 345 A.2d 436 (1975); *State v. Foster,* 263 Md. 388, 397, 283 A.2d 411 (1971), *cert. denied,* 406 U.S. 908, 92 S.Ct. 1616, 31 L.Ed.2d 818 (1972), and the numerous cases cited in *Foster.* We perceive no error in the instruction here viewed as a whole.

JUDGMENT AFFIRMED EXCEPT AS TO THE IMPOSITION OF THE DEATH SENTENCE; DEATH SENTENCE VACATED AND CASE REMANDED TO THE

CIRCUIT COURT FOR CHARLES COUNTY FOR A NEW SENTENCING PROCEEDING UNDER SECTION 413 OF ARTICLE 27; COSTS TO BE PAID BY COUNTY COMMISSIONERS OF SOMERSET COUNTY.